1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

JERRY LUM, et al.,

10                                    NO. CIV. S-10-1807 LKK/DAD

11          Plaintiffs,

12     v.

                                       O R D E R
13  COUNTY OF SAN JOAQUIN,
et al.,

14

15          Defendants.

16  _____/

17      This is a § 1983 civil rights and state law wrongful death

18  action against San Joaquin County, the City of Lathrop, and

19  multiple city and county employees.  It arises out of the death of

20  plaintiffs' son following his release from the San Joaquin County

21  Jail. Defendants County of San Joaquin ("the County") and City of

22  Lathrop ("the City") and Sergeants Walters and Pease ("the

23  arresting officers") now move to dismiss portions of the first

24  amended complaint.  The City moves to dismiss plaintiff's first

25  claim for unlawful arrest; the fifth claim for disability

26  discrimination under the ADA; and plaintiff's sixth claim for

1 wrongful death. The County moves to dismiss plaintiff's sixth claim
2 for wrongful death. The arresting officers move to dismiss the ADA
3 and wrongful death claims. The defendants also challenge
4 plaintiffs' standing on all claims. For the reasons described
5 herein, certain of the motions are GRANTED, others DENIED, and
6 plaintiffs are GRANTED leave to amend their complaint.

7                          **I. BACKGROUND**

8       Plaintiffs' first amended complaint ("FAC") makes the
9 following allegations:

10 **A. Plaintiffs and Decedent**

11      Plaintiffs, Jerry Lum and Dorothea Timmons, are the parents,
12 heirs, successors in interest, and survivors of the decedent,
13 Jeremy Lum. (FAC at ¶ 4.) At the time of his death, decedent was
14 under psychiatric care for a bipolar disorder. (FAC at ¶ 21.)
15 Decedent had a history of psychotic episodes, including
16 hallucinations, which resulted in at least three admissions to St.
17 Joseph's Behavioral center in Stockton, California. (FAC at ¶ 21.)
18 Decedent used prescription medications to control his bipolar
19 disorder, including anti-seizure and anti-psychotic medications.
20 (FAC at ¶¶ 21, 42.) Despite his diagnosis, however, decedent was
21 able to maintain employment and participate in athletics. (FAC at
22 ¶ 22.)

23      On July 8, 2009, at approximately 11:00 pm, one of decedent's
24 neighbors observed that decedent was "not in his right mind, and
25 appeared disoriented and lost". In addition the decedent was
26 barefoot and had vomit on his shirt. (FAC at ¶ 27-28.) The

1  neighbor, Mr. Archuleta, contacted police after decedent came up

2  onto his porch, looking for a girl named "Adriana." (FAC at ¶¶ 27,

3  30.)  Mr. Archuleta did not know "Adriana" or decedent.  (FAC at

4  ¶ 27.)  Mr. Archuleta also told police that decedent was "gazing

5  past his line of sight as if he was looking at nothing, and pacing

6  back and forth, confused." (FAC at ¶ 28.)

7       After leaving the Archuleta residence, decedent was seen

8  walking across the street near a local bar, crossing a busy street

9  toward the City Park, and standing "with his arms wrapped around

10 a post." (FAC at ¶ 29.)  A bartender walking home from work

11 encountered decedent while he was standing with his arms around the

12 post and asked decedent if he was "okay." (FAC at ¶ 29.) Decedent

13 told the bartender that he was "okay." (FAC at ¶ 29.)  The

14 bartender found decedent's behavior to be "unusual," but he did not

15 believe decedent to be drunk.  (FAC at ¶ 29.)

16 **B. The Arresting Officers**

17      Decedent was arrested at approximately 1:00 am on July 9,

18 2009, in response to Mr. Archuleta's call.  (FAC at ¶ 31.)  Once

19 decedent was under police custody, Archuleta asked police "[w]hat's

20 the problem?"  One of the sergeants responded, "[h]e's probably

21 just off his meds." (FAC at ¶ 30.)  The arresting officers booked

22 decedent into the San Joaquin County Jail on a "kickout" charge,

23 meaning that he would be released from jail six hours later.  (FAC

24 at ¶ 31.)

25      When decedent was arrested he had a laceration on his foot,

26 difficulty walking, vomit on his shirt, and was behaving strangely.

3

1  (FAC at ¶ 35.)  The arresting officers did not take any action to
2  evaluate decedent's physical or mental state or inquire as to
3  whether hospitalization, or an involuntary hold, pursuant to
4  California Welfare & Institutions Code sections 5150 or 5170, was
5  necessary.  (FAC at ¶ 35.)

6       According to later accounts by the arresting officers,
7  decedent smelled of alcohol; however, no one else that had
8  encountered decedent that night smelled alcohol on him or suspected
9  that he had been drinking.  (FAC at ¶ 32.)  Defendants tested
10 decedent's blood alcohol level and found none in his system.  (FAC
11 at ¶ 33.)  Plaintiffs suspect that decedent was hallucinating as
12 he stood up every 30 seconds saying he saw or heard somebody who
13 was not there, but other than that, decedent was cooperative with
14 police.  (FAC at ¶ 34.)

15 **C. The County Jail**

16      After his arrest, decedent was booked into the San Joaquin
17 County Jail.  (FAC at ¶ 35.)  Officer Mendoza was working in the
18 booking area when decedent was brought in for being "under the
19 influence in public" and "he specifically remember[ed] Jeremy Lum
20 telling him that he had bipolar disorder and takes [sic]
21 medication."  (FAC at ¶ 37.)  Officer Mendoza observed decedent
22 "bouncing off the walls and attempting to open imaginary doors and
23 speaking to himself."  (FAC at ¶ 38.)

24      While decedent was in his holding cell, he had hallucinations
25 and also suffered from a seizure.  (FAC at ¶ 38.)  The jail staff
26 did not order a medical or psychiatric evaluation or otherwise

4

1  obtain medical treatment for decedent. (FAC at ¶¶ 38-39.)  Decedent

2  was released from the County jail on July 9, 2010, at 7:36 am,

3  "without successful family notification, transportation, money,

4  phone, or shoes."  (FAC at ¶ 40.)

5  **D. After Decedent's Release From County Jail**

6      By approximately 6:00 pm on July 9, 2009, decedent had not

7  returned home; his family commenced a search for him and soon

8  learned of his arrest and release from jail.  (FAC at ¶ 41.)

9  Later that evening, the family filed a missing person's report and

10 tried to impress upon the police decedent's need for medication.

11 (FAC at ¶ 42.)  The search was to no avail and at approximately

12 5:00 pm on July 12, 2009, decedent's body was found floating in the

13 San Joaquin River, approximately two miles west of the County jail.

14 (FAC at ¶ 44.)  The San Joaquin County Coroner's report concluded

15 that the cause of death was accidental drowning with MDMA (ecstasy)

16 and Orphenadrine intoxication.  (FAC at ¶ 45.)  None of decedent's

17 regular prescription medications were found in his system.  (FAC

18 at ¶ 45.)

19 **II. STANDARD FOR A FED. R. CIV. P. 12(B)(6) MOTION TO DISMISS**

20     A Fed. R. Civ. P. 12(b)(6) motion challenges a complaint's

21 compliance with the pleading requirements provided by the Federal

22 Rules. In general, these requirements are established by Fed. R.

23 Civ. P. 8, although claims that "sound[] in" fraud or mistake must

24 meet the requirements provided by Fed. R. Civ. P. 9(b). <u>Vess v.</u>

25 <u>Ciba-Geigy Corp.</u>, 317 F.3d 1097, 1103-04 (9th Cir. 2003).

26     Under Federal Rule of Civil Procedure 8(a)(2), a pleading must

1  contain a "short and plain statement of the claim showing that the

2  pleader is entitled to relief." The complaint must give defendant

3  "fair notice of what the claim is and the grounds upon which it

4  rests." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)

5  (internal quotation and modification omitted).

6      To meet this requirement, the complaint must be supported by

7  factual allegations. <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1950

8  (2009). "While legal conclusions can provide the framework of a

9  complaint," neither legal conclusions nor conclusory statements are

10  themselves sufficient, and such statements are not entitled to a

11  presumption of truth. <u>Id.</u> at 1949-50. <u>Iqbal</u> and <u>Twombly</u> therefore

12  prescribe a two step process for evaluation of motions to dismiss.

13  The court first identifies the non-conclusory factual allegations,

14  and the court then determines whether these allegations, taken as

15  true and construed in the light most favorable to the plaintiff,

16  "plausibly give rise to an entitlement to relief." <u>Id.</u>; <u>Erickson</u>

17  <u>v. Pardus</u>, 551 U.S. 89 (2007).[1]

18      "Plausibility," as it is used in <u>Twombly</u> and <u>Iqbal</u>, does not

19  refer to the likelihood that a pleader will succeed in proving the

20  allegations. Instead, it refers to whether the non-conclusory

21  factual allegations, when assumed to be true, "allow[] the court

22

23      [1] As discussed below, the court may consider certain limited
24  evidence on a motion to dismiss. As an exception to the general
   rule that non-conclusory factual allegations must be accepted as
   true on a motion to dismiss, the court need not accept allegations
25  as true when they are contradicted by this evidence. <u>See</u> <u>Mullis v.</u>
   <u>United States Bankr. Ct.</u>, 828 F.2d 1385, 1388 (9th Cir. 1987),
26  <u>Durning v. First Boston Corp.</u>, 815 F.2d 1265, 1267 (9th Cir. 1987).

6

1  to draw the reasonable inference that the defendant is liable for
2  the misconduct alleged." _Iqbal_, 129 S.Ct. at 1949. "The
3  plausibility standard is not akin to a 'probability requirement,'
4  but it asks for more than a sheer possibility that a defendant has
5  acted unlawfully." _Id._ (quoting _Twombly_, 550 U.S. at 557). A
6  complaint may fail to show a right to relief either by lacking a
7  cognizable legal theory or by lacking sufficient facts alleged
8  under a cognizable legal theory. _Balistreri v. Pacifica Police_
9  _Dep't_, 901 F.2d 696, 699 (9th Cir. 1990).

10       The line between non-conclusory and conclusory allegations is
11  not always clear. Rule 8 "does not require 'detailed factual
12  allegations,' but it demands more than an unadorned, the-defendant-
13  unlawfully-harmed-me accusation." _Iqbal_, 129 S. Ct. at 1949
14  (quoting _Twombly_, 550 U.S. at 555). While _Twombly_ was not the first
15  case that directed the district courts to disregard "conclusory"
16  allegations, the court turns to _Iqbal_ and _Twombly_ for indications
17  of the Supreme Court's current understanding of the term. In
18  _Twombly_, the Court found the naked allegation that "defendants
19  'ha[d] entered into a contract, combination or conspiracy to
20  prevent competitive entry . . . and ha[d] agreed not to compete
21  with one another,'" absent any supporting allegation of underlying
22  details, to be a conclusory statement of the elements of an anti-
23  trust claim. _Id._ at 1950 (quoting _Twombly_, 550 U.S. at 551). In
24  contrast, the _Twombly_ plaintiffs' allegations of "parallel conduct"
25  were not conclusory, because plaintiffs had alleged specific acts
26  argued to constitute parallel conduct. _Twombly_, 550 U.S. at 550-51,

1   556.

2        <u>Twombly</u> also illustrated the second, "plausibility" step of

3   the analysis by providing an example of a complaint that failed and

4   a complaint that satisfied this step. The complaint at issue in

5   <u>Twombly</u> failed. While the <u>Twombly</u> plaintiffs' allegations regarding

6   parallel conduct were non-conclusory, they failed to support a

7   plausible claim. <u>Id.</u> at 566. Because parallel conduct was said to

8   be ordinarily expected to arise without a prohibited agreement, an

9   allegation of parallel conduct was insufficient to support the

10  inference that a prohibited agreement existed. <u>Id.</u> Absent such an

11  agreement, plaintiffs were not entitled to relief. <u>Id.</u>[2]

12       In contrast, <u>Twombly</u> held that the model pleading for

13  negligence demonstrated the type of pleading that satisfies Rule

14  8. <u>Id.</u> at 565 n.10. This form provides "On June 1, 1936, in a

15  public highway called Boylston Street in Boston, Massachusetts,

16  defendant negligently drove a motor vehicle against plaintiff who

17  was then crossing said highway." Form 9, Complaint for Negligence,

18  Forms App., Fed. Rules Civ. Proc., 28 U.S.C. App., p 829. These

19  allegations adequately "'state[] . . . circumstances, occurrences,

20  and events in support of the claim presented.'" <u>Twombly</u>, 550 U.S.

21  at 556 n.3 (quoting 5 C. Wright & A. Miller, Federal Practice and

22  Procedure § 1216, at 94, 95 (3d ed. 2004)). The factual allegations

23  _____

24       [2] This judge must confess that it does not appear self-evident
     that parallel conduct is to be expected in all circumstances and
25   thus would seem to require evidence. Of course, the Supreme Court
     has spoken and thus this court's own uncertainty needs only be
26   noted, but cannot form the basis of a ruling.

1   that defendant drove at a certain time and hit plaintiff render

2   plausible the conclusion that defendant drove negligently.

3                            **III. ANALYSIS**

4       Defendants move to dismiss plaintiffs' first claim, as to the

5   City; plaintiff's fifth claim as to both the City and the arresting

6   officers; and the sixth claim for relief as to the City, the

7   County, and the arresting officers for failure to state a claim for

8   relief under Rule 12(b)(6).  Defendants also seek to dismiss each

9   of Plaintiffs' first through fifth and seventh claims in their

10  entirety for lack of standing.

11  **A. Plaintiff's First Claim: 42 U.S.C. §1983 (Alleged Violation Of Decedent's Fourth Amendment Rights)**

12      Plaintiffs allege as their first claim a violation of 42

13  U.S.C. §1983 against the arresting officers, the City, and "Does

14  1-25." (FAC at ¶¶ 54-59.)  Plaintiffs base this claim on their

15  assertion that the defendants unlawfully arrested decedent.  (FAC

16  at ¶ 55.)  Defendants contend that this claim should be dismissed

17  as to the City because plaintiffs have not established municipal

18  liability.

19      Title 42 U.S.C. § 1983 provides in relevant part:

20          "Every person who, under color of any statute,
21          ordinance, regulation, custom, or usage, of any State or
            Territory or the District of Columbia, subjects, or
22          causes to be subjected, any citizen of the United States
            or other person within the jurisdiction thereof to the
23          deprivation of any rights, privileges, or immunities
            secured by the Constitution and laws, shall be liable to
24          the party injured in an action at law, suit in equity,
            or other proper proceeding for redress."

25

26      Because a municipality cannot be held liable for a violation

                                   9

1  of Section 1983 solely because it employs a tortfeasor, plaintiff

2  must first show that the municipal action was taken with the

3  requisite degree of culpability and must demonstrate a causal link

4  between the municipal action and the deprivation of federal rights.

5  Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397

6  (1997).   Plaintiffs may accomplish this by proving one of three

7  conditions:

8           (1) A city employee committed the alleged constitutional
            violation pursuant to a formal governmental policy or a
9           longstanding practice or custom which constitutes the
            standard operating procedure of the local governmental
10          entity;

11          (2) The individual who committed the constitutional tort
            was an official with final policy-making authority and
12          therefore the challenged action itself constituted an
            act of official governmental policy; or
13
            (3) An official with final policy-making authority
14          ratified a subordinate's unconstitutional action and the
            basis for it.
15

16          Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996).

17      Defendants contend that plaintiffs have alleged no factual

18  predicate for inferring that the City has an official policy or

19  custom that leads to unlawful arrests. (Def's Mtn Dis. at 7: 3-5.)

20  Plaintiffs counter that they are not alleging "a formal

21  governmental policy or a longstanding practice or custom," rather

22  that the arresting officers had final policy-making authority and

23  either violated the constitution themselves or ratified a

24  subordinate's unconstitutional action and the basis for it.

25  Defendants argue that even if plaintiffs proceed under this theory,

26  they plead only conclusory factual allegations in support of their

10

1   proposition.

2        In order to establish municipal liability, Plaintiffs must

3   plead facts that establish a single or recurring unconstitutional

4   action by an individual with "final policy-making authority."

5   Generally speaking, whether an individual has "final policy-making

6   authority" with regard to the challenged action is a matter of

7   state law.  St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988)

8   (plurality opinion) ("[T]he challenged action must have been taken

9   pursuant to a policy adopted by the official or officials

10  responsible under state law for making policy in that area of the

11  city's business").

12       The court disagrees with plaintiffs' proposition that state

13  law is merely a "starting point" for our analysis, (see Pl's Oppo

14  at 6, n. 3). This issue remains unresolved, but the plurality in

15  Praprotnik explicitly disagreed with this assessment.  However, the

16  High Court has not precluded municipal liability in situations

17  where an official who possesses such authority delegates it and

18  creates a "custom or usage" having the force of law.

19       Plaintiffs allege that "in the City of Lathrop, police

20  sergeants, including Sergeant Walters and Pease, are invested by

21  law-or by a 'custom or usage' having the force of law-with 'final

22  policymaking authority' to effect arrests and/or ratify or sanction

23  arrests made by other officers." (FAC at ¶ 56.) They further

24  allege, based on this assertion, that "Sergeant Walters and Pease

25  were acting as municipal officials with 'final policymaking

26  authority' when they effected and/or ratified or sanctioned Jeremy

                                    11

1   Lum's arrest."  (FAC at ¶ 56.)

2        The court finds that plaintiffs have pled sufficient facts to

3   maintain a claim for municipal liability under Section 1983.  The

4   court is required to assume the non-conclusory factual allegations

5   of the complaint are true, and construe them in the light most

6   favorable to the plaintiffs.   Plaintiffs have pled facts

7   indicating, at least plausibly that decedent was wrongfully

8   arrested (decedent was booked on a public intoxication charge

9   although he did not any alcohol in his blood, while police conceded

10  that he was "probably just off his meds").

11       The complaint further alleges that the decision to arrest and

12  book on a "kickout" charge, as opposed to the decision to pursue

13  other alternatives, was made by the arresting officers, and that

14  sergeants in the City of Lathrop customarily have the final

15  authority regarding these arrests. These allegations adequately

16  "'state[] . . . circumstances, occurrences, and events in support

17  of the claim presented.'" <u>Twombly</u>, 550 U.S. at 556 n.3 (quoting

18  Wright & A. Miller, Federal Practice and Procedure § 1216 at 94,

19  95). The factual allegations that the arresting officers made the

20  independent and seemingly discretionary decision to unlawfully

21  arrest decedent, renders plausible the conclusion that sergeants

22  generally have at least been delegated final policymaking authority

23  as to arrests in the City of Lathrop.[3]

24  _____

25       [3] At oral argument defendants contended that the 9th Circuit
    has held that police sergeants do not have final authority as a
26  mater of law, relying on <u>Collins v. City of San Diego</u> 841 F.2d 337
    at 341(9th Cir 1987). Collins is clearly distinguishable,

1    The court finds that plaintiffs have pled a factual predicate
2    that gives rise to a plausible finding of municipal liability as
3    to plaintiffs' Section 1983 claim. Accordingly, defendants' motion
4    to dismiss plaintiff's first claim for relief for unlawful arrest
5    is DENIED.

6    Moreover, it appears to the court that the existence of a
7    "kickout" arrest suggests a policy which, under the facts and
8    circumstances of this case, perhaps raise a plausible basis for
9    municipal liability.   Accordingly, if the facts support such a
10   cause of action, plaintiffs are GRANTED leave to amend their
11   complaint to state a claim under the first theory of municipal
12   liability; that the City of Lathrop had a policy or custom and
13   usage that resulted in a violation of decedent's Fourth Amendment
14   rights.

15   **B.  Plaintiffs' Fifth Claim: Violation Of The Americans With
       Disabilities Act (ADA)**
16

17   Plaintiffs' fifth claim is that the arrest and detention of
18   decedent violated the Americans with Disabilities Act. City
19   defendants argue, relying on <u>Foley v. Klickitat County</u>, No.
20   CV-08-3068, 2009 WL 5216992 (E.D. Wa. Dec. 30, 2009), that
21   plaintiffs' fifth claim fails as to both the arresting officers and
22   the city because the ADA does not apply to arrests. The County is
23   not moving to dismiss the ADA claim against it.  Defendants also
24   contend that even if the ADA applies to incarcerated individuals,

25   addressing as it does the question of hiring and firing. In any
26   event, here plaintiffs rely on long-standing practice to establish
     authority, a matter not addressed by <u>Collins</u>.

1  the arresting officers, who are city employees, cannot be liable

2  because they no longer had custody of decedent after booking him

3  into the San Joaquin County Jail, and therefore the City also

4  cannot be liable because there is no *respondeat superior*

5  relationship between the County jail and the City. (Def's Mtn Dis.

6  at 11: 15-19.)

7      Plaintiffs respond arguing that <u>Foley</u> is not binding on this

8  court and further, that it is not persuasive because it is merely

9  a cursory analysis of the ADA. (Pl's Oppo at 7: 13-16.) Plaintiffs

10  base their contention on the reasoning contained within several

11  district court decisions, as well as the Ninth Circuit opinion in

12  <u>Thompson v. Davis</u>, 295 F.3d 890 (9th Cir. 2002) (holding that

13  decisions to parole constitute an "activity of a public entity"

14  that falls within the reach of the ADA.) [4]

15      For the reasons discussed below, the court agrees with

16  plaintiffs' assessment of the ADA.  However, the court finds that

17  the ADA does not apply to individual officers; therefore,

18  defendants motion is GRANTED as to the arresting officers and

19  DENIED as to the City.

20      Title II of the ADA, 42 U.S.C. § 12132, prohibits a public

21  entity from discriminating against a qualified individual with a

22  disability on the basis of disability.  <u>Weinreich v. L.A. County</u>

---

23

24      [4] Plaintiffs also contend that even if the court does not find
   that an arrest is the type of "service, program or activity"
   contemplated by the ADA, this would not dispense with the entirety
25  of plaintiffs' fifth claim because plaintiffs are also contesting
   the legality of decedent's arrest. Given the disposition above the
26  court need not consider this argument.

1   Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997). To state

2   a claim of disability discrimination under Title II, the plaintiff

3   must allege four elements:

> (1) [P]laintiff is an individual with a disability; (2) plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. Weinreich, 114 F.3d at 978.

10      The Ninth Circuit has not addressed the question of whether

11  the ADA applies to arrests.   See Thompson, 295 F.3d at 897.

12  However, that court has determined that local law enforcement

13  agencies' activities fall within the statute. 42 U.S.C. § 12131(1);

14  Lee v. City of L.A., 250 F.3d 668, 691 (9th Cir. 2001) (citing

15  Gorman v. Bartch, 152 F.3d 907, 912-13 (8th Cir. 1998) (holding

16  that transportation of an arrestee to a police station is a

17  "service" under the ADA)).

18      There are two theories generally recognized by courts in

19  applying the ADA in the context of arrests. See Gohier v. Enright,

20  186 F.3d 1216, 1221 (10th Cir. 1999).   First, where police wrongly

21  arrested someone with a disability because they misperceived the

22  effects of that disability as criminal activity.   Id. at 1220.

23  Second, where although police have properly investigated and

24  arrested a person with a disability for a crime unrelated to that

25  disability, they failed to reasonably accommodate the person's

26  disability in the course of investigation or arrest, causing the

1  person to suffer greater injury or indignity in that process than

2  other arrestees.  Id. at 1220-21 (citing Gorman, 152 F.3d at 912-13

3  (holding such claim viable); Rosen, 121 F.3d at 157-58 (suggesting

4  in *dicta* such claim not viable); Patrice v. Murphy, 43 F.Supp.2d

5  1156 (W.D. Wash. 1999) (holding such claim not viable.))

6      Plaintiffs are alleging both theories, therefore, the court

7  must address the applicability of both.  For the reasons discussed

8  below, the court finds that the weight of Ninth Circuit authority,

9  as well as the persuasive authority on point, leads to the

10 conclusion that both theories are viable under the ADA.

11     The first scenario, where an individual is wrongfully

12 arrested, fits squarely within the ADA's prohibition against

13 discrimination upon the basis of a disability.  See Weinreich, 114

14 F.3d at 978 ("in order to maintain an ADA claim, plaintiff must

15 allege that plaintiff was either excluded ... *or was otherwise*

16 *discriminated against by the public entity*.") (emphasis added).

17     In the event that decedents' arrest was found lawful, the

18 second theory is equally viable, as the court finds that arrests

19 are "activities" of a public entity.   In Bay Area Addiction

20 Research and Treatment, Inc. v. City of Antioch, the Ninth Circuit

21 interpreted Title II's "programs" and "activities" to include "

22 'all of the operations of' a qualifying local government."  179

23 F.3d 725, 731 (9th Cir. 1999). In reaching this conclusion, the

24 court noted that Congress specifically rejected an approach that

25 could have left room for exceptions to § 12132's prohibition on

26 discrimination by public entities.  Id. at 732.   This broad

16

1  interpretation of the ADA was confirmed by <u>Lee v. City of L.A.</u> when

2  the court stressed that "[q]uite simply, the ADA's broad language

3  brings within its scope 'anything a public entity does,'" 250 F.3d

4  at 691 (quoting <u>Yeskey v. Pa. Dep't of Corr.</u>, 118 F.3d 168, 171 &

5  n. 5 (3d Cir. 1997), aff'd 524 U.S. 206 (1998)); <u>see</u> <u>also</u> <u>McGary</u>

6  <u>v. City of Portland</u>  386 F.3d 1259, 1268 (9th Cir. 2004) ("the ADA

7  must be construed broadly in order to effectively implement the

8  ADA's fundamental purpose").

9      This broad interpretation of the ADA has led the Ninth Circuit

10  to additionally warn against "carving out 'spheres in which public

11  entities may discriminate on the basis of an individual's

12  disability .'" <u>McGary</u>, 386 F.3d at 1269 (quoting <u>Thompson</u>, 295 F.3d

13  at 899.) In <u>Thompson</u>, the Ninth Circuit rejected an attempt to

14  exempt parole decisions from the ADA under the reasoning that the

15  ADA does not reach substantive decision-making in the context of

16  the criminal law. The court cited with approval the Tenth Circuit's

17  holding that the ADA applies to arrests. <u>Id.</u> at 897 (citing <u>Gohier</u>,

18  186 F.3d at 1221 ("[A] broad rule categorically excluding arrests

19  from the scope of Title II ... is not the law.")).

20      The court also noted that under the ADA regulations, law

21  enforcement is obligated to modify "policies that result in

22  discriminatory arrests *or abuse of individuals with disabilities*."

23  <u>Thompson</u>, 295 F.3d at 897 (quoting 28 C.F.R. Pt. 35, App. A §

24  35.130 (2000)) (emphasis added).  The court distinguished the

25  Fourth Circuit's holding in <u>Rosen v. Montgomery County Maryland</u>,

26  121 F.3d 154 (4th Cir. 1997), because that decision was not based

1  upon a concern that the ADA would impermissibly interfere with the

2  substantive decisions involved in arrests. Rather, reasoning that

3  the statutory text of the ADA implied voluntariness on the part of

4  the individual, it held that an arrest was not a "program or

5  activity" of the defendant County. Id. at 157-58.  This reasoning

6  has now been discredited by the Supreme Court. Yeskey, 524 U.S. at

7  211 ("[T]he words [of § 12132] do not connote voluntariness.").

8      Considering the Ninth Circuit's broad interpretation of the

9  ADA, it seems antithetical to established case law to "carve out"

10  an exception for arrests.  Arrests are both subject to the ADA's

11  prohibition against discrimination on the basis of disability and

12  the duty to provide reasonable accommodations during arrests.

13  Accordingly, the motion to dismiss plaintiff's ADA claim is DENIED.

14  Clearly, however, the ADA, by its terms does not apply to the

15  officers.

16  **C. Plaintiffs' Sixth Claim For Wrongful Death/Negligence and the**
    **California Torts Claim Act Immunities**

17

18      Plaintiffs' sixth claim alleges that the defendants were

19  negligent and are thus liable for decedent's death.  Plaintiffs

20  allege that "[t]he arresting officers ignored the laceration on

21  Jeremy's foot, Jeremy's difficulties walking, the vomit on Jeremy's

22  shirt, and Jeremy's strange behavior which a reasonable officer in

23  Defendants' position should have attributed to something other than

24  alcohol intoxication; they did not take any action to evaluate

25  Jeremy's physical or mental state or inquire as to whether

26  hospitalization, or an involuntary hold, pursuant to Cal. Welfare

1   & Institutions Code §§ 5150 or 5170, was necessary, instead of
2   arresting and booking Jeremy in the San Joaquin County Jail on
3   'kickout' charges." (FAC at ¶ 35.)

4       Plaintiffs further allege that the act of arresting decedent
5   created a "special relationship" and a correlating duty "not to
6   leave him in a situation that was more dangerous than the one in
7   which they found him." (FAC at ¶¶ 96-97.)  Plaintiffs state that
8   "defendants breached this duty by failing to give decedent a
9   medical or psychiatric evaluation and/or treatment and by deciding
10  to release him alone six miles from his home without money, shoes,
11  a cellular phone, means of transportation and without means or
12  wherewithal to get home, shelter, or assistance." (FAC at ¶ 98.)

13      Plaintiffs allege that defendants arresting officers left
14  decedent in a dangerous situation by placing him in jail on a
15  "kickout" charge because "the Arresting Officers knew or should
16  have known that the County had a policy of releasing 'kickouts'
17  after an arbitrary period of time." (FAC at ¶ 36.)  Defendants
18  argue that plaintiffs' negligence and wrongful death claims fail
19  due to the "numerous and broad immunities" contained in the
20  California Torts Claim Act.[5]

21  _____

22      [5] Defendants also assert that plaintiffs' Seventh Claim for
    "False Arrest" is also precluded by the various immunities
    contained in the Torts Claim Act; however, under California law,
23  a police officer is not granted statutory immunity for false arrest
    and imprisonment.  See Asgari v. City of Los Angeles, 15 Cal.4th
24  744, 752 (1998). Government Code §820.4, which grants immunity for
    a public employee's "act or omission, exercising due care, in the
25  execution or enforcement of any law," provides that: "nothing in
    this section exonerates a public employee from liability for false
26  arrest or false imprisonment."

1          "Conceptually, the question of the applicability of a

2   statutory immunity does not even arise until it is determined that

3   a defendant otherwise owes a duty of care to the plaintiff and thus

4   would be liable in the absence of such immunity." Davidson v. City

5   of Westminster, 32 Cal.3d 197, 201-02 (1982).  Therefore the court

6   must first address whether, under California law, the defendants

7   owed a duty of care to decedent.

8   **i. Defendants Owed Decedent A Duty Of Care**

9          Plaintiffs argue that when the arresting officers took

10  decedent into custody, a special relationship and corresponding

11  duty to act reasonably to protect decedent was created.

12         The elements of a cause of action for negligence include a

13  legal duty to use due care.  Evan F. v. Hughson United Methodist

14  Church, 8 Cal.App.4th 828, 834 (3d Dist. 1992).  The existence of

15  a duty of care is a question of law to be determined by the court

16  alone.  Ballard v. Uribe, 41 Cal.3d 564, 572, fn. 6 (1986).  This

17  is because "legal duties are ... merely conclusory expressions

18  that, in cases of a particular type, liability should be imposed

19  for damage done." Tarasoff v. Regents of University of California,

20  17 Cal.3d 425, 434 (1976).

21         A person who has not created a peril is not liable in tort

22  merely for failure to take affirmative action to protect another

23  unless there is some relationship between them that gives rise to

24  a duty to act.  Williams, 34 Cal.3d at 23.  In the absence of a

25  clearly established special relationship, the court should apply

26  the multi-factor public policy analysis first articulated in

Rowland v. Christian, 69 Cal.2d 108, 113 (1968). For the reasons discussed below, the Court finds that there is a well-established special relationship between jailers and prisoners that is equally applicable to officers of the law who take arrestees into custody. See Giraldo v. Cal. Dep't of Corr., 168 Cal.App.4th 231 (3d Dist. 2008).

In Giraldo, the court addressed, as an issue of first impression, whether jailers have a duty to protect inmates from foreseeable harm by third parties. 168 Cal.App.4th at 250. In that case, plaintiff, a male-to-female transgender person, was an inmate in the California prison system. Id. at 237. Plaintiff filed an action against the California Department of Corrections and Rehabilitation (CDCR) and various CDCR personnel "challeng[ing] prison policies that place transgender inmates, such as [plaintiff], who have the physical appearance of women, in the male inmate population without any meaningful precaution to the obvious risk of sexual assault to them." Id.

In finding a duty, the court reasoned that "it has been observed that a typical setting for the recognition of a special relationship is where 'the plaintiff is particularly vulnerable and dependent' upon the defendant who, correspondingly, has some control over the plaintiff's welfare." Giraldo, 168 Cal.App.4th at 245-46 (quoting Kockelman v. Segal, 61 Cal.App.4th 491, 499 (1998)). The Court cited expansive authority for finding that a "special relationship" existed between jailer and prisoner, including legal encyclopedias, the Restatement (Second) of Torts,

1  and both state and federal case law.  Id. at 246-50.

2      Ultimately, the Court based its decision on two factors,

3  foreseeability and vulnerability/dependence.  Id. at 250.  The

4  Court found that it was "manifestly foreseeable that an inmate may

5  be at a risk of harm [as recently passed legislation] recognizing

6  the serious problem presented by sexual abuse in the prison

7  environment."  Id.  As here, it is reasonably foreseeable that an

8  arrestee who is in need of medical attention would be at risk in

9  a custodial environment or upon release into a situation made

10 dangerous by his medical condition, or without first having

11 received proper medical attention.

12     Both prisoners and arrestees are equally vulnerable and

13 dependent on officers and jailers for safety and security.

14 "Prisoners are vulnerable.  And dependent.  Moreover, the

15 relationship between them is protective by nature, such that the

16 jailer has control over the prisoner, *who is deprived of the normal*

17 *opportunity to protect himself*."  Id. at 250.  In this case, the

18 purpose of arresting decedent, who was "just off of his meds," on

19 a "kickout" charge, was at least partially for decedant's own self

20 protection, making the restraint used by the arresting officers

21 just as "protective in nature" as the custodial relationship that

22 exists between jailer and prisoner.

23     Abiding by the precedent set in Giraldo, the court finds that

24 the jailer-prisoner relationship creates a duty of care as to the

25 County.  The court further finds the relationship to be analogous

26 to law enforcement officers and arrestees.  Officers and jailers

1  have a duty to act with reasonable care toward those in their

2  custody.

3  **i.  Government Code Section 845.8**

4      Defendant contends that plaintiffs' sixth claim is barred by

5  Government Code Section 845.8(a), which provides:

6          Neither a public entity nor a public employee is liable
           for: (a) Any injury resulting from determining whether
7          to parole or release a prisoner or from determining the
           terms and conditions of his parole or release or from
8          determining whether to revoke his parole or release.

9      Plaintiffs make several arguments in opposition to this

10 contention.  First, they argue that decedent was not a "prisoner"

11 at the time of the injury (i.e. when he drowned in the river).

12 Second, they assert that this situation is not within the scope of

13 what the legislature intended Section 845.8 to prevent.  Third,

14 they assert that even if the court finds this section to be

15 applicable, it can only apply to the County because at the time of

16 the arrest, decedent was not a prisoner.  Finally, they take issue

17 with defendants' characterization of this immunity as "absolute."

18     The court finds that this immunity does not extend to the City

19 or its officers, as the statute specifically deals with decisions

20 to release prisoners, not decisions to arrest individuals or book

21 arrestees into jail.  The court also agrees with plaintiffs'

22 proposition that this statutory immunity is not "absolute."

23     In <u>Johnson v. State of California</u>, (1968), the California

24 Supreme Court discussed the scope of Section 845.8(a) immunity, in

25 the context of a claim of immunity by the state for injuries

26 arising out of the Youth Authority's decision to place a dangerous

1  youth who was on parole in a foster home. 69 Cal.2d 782, 784-785
2  (1968).   The youth had displayed homicidal tendencies, including
3  violence and cruelty to both animals and people, none of which was
4  revealed to the foster parents.   Id.   The youth subsequently
5  assaulted one of the foster parents. Id. at 785.

6       The Court held that the state's decision whether to warn the
7  foster parents of the youth's dangerous propensities was not within
8  845.8(a)'s immunity for an injury resulting from a determination
9  to parole or release a prisoner because "[o]nce the proper
10 authorities have made the basic policy decision-to place a youth
11 with foster parents, for example, the role of section 845.8
12 immunity ends."   Johnson, 69 Cal.2d at 786, 799.   The Court
13 reasoned that there is an important distinction between basic or
14 discretionary decisions on the one hand and ministerial decisions
15 implementing the basic decision on the other hand.   Id.   That is,
16 actions implementing the basic policy decision are outside the
17 scope of the immunity.

18      As plaintiffs contend, that distinction applies in the instant
19 case. Plaintiffs allege that the injuries to decedent resulted from
20 "ministerial acts" made after the initial decision to release
21 decedent.   Government Code Section 845.8(a) does not preclude
22 plaintiffs from raising a plausible claim for wrongful death
23 against the County, the City or the arresting officers under this
24 theory; however, insofar as the negligence charged is the basic
25 decision to release decedent, there can be no liability.
26 ////

**ii. Government Code Section 846**

Defendant contends that plaintiffs' sixth claim is also barred by Government Code §846, which provides in relevant part "{n}either a public entity not a public employee is liable for injury caused by ... the failure to retain an arrested person in custody." Defendants assert that this language is "clear" and that neither the City nor the County nor its employees can be held liable for the fact that they did not retain decedent in custody. Again plaintiffs argue that section 846 does not apply in instances where officers have a "special relationship" with the arrested person. (Pl's Opp. at 17: 10-12.)

Plaintiffs argument is misplaced. The existence of a "special relationship" is not an exception to immunity under §846. Cases that discuss the issue of "special relationship" in relation to government immunities do so in the context of whether there is a duty of care. The duty question is the threshold to a discussion of government immunity, see Davidson, 32 Cal.3d at 201-02, and the issues are distinct. The cases that deny plaintiff recovery do not do so because the courts have found governmental immunity but because the applicable officers lacked a duty of care in relation to the plaintiffs or victims. See Jackson v. Clements, 146 Cal.App.3d 983 (1st Dist. 1983); City of Sunnyvale v. Superior Court, 203 Cal.App.3d 839 (6th Dist. 1988); Lehto v. City of Oxnard, 171 Cal.App.3d 285 (2d Dist. 1985); Stout v. City of Porterville, 148 Cal.App.3d 937 (5th Dist. 1983). Further, the cases that find the immunity inapplicable, such as Morgan and

25

1  <u>Johnson</u> do not do so on the basis of a "special relationship," but

2  because the negligence alleged is not merely the release of a

3  violent prisoner.

4      Courts have routinely applied Section 846 immunity where

5  police officers release someone who then goes on to harm a third

6  party. <u>See, e.g.</u>, <u>Santa Barbara v. Superior Court</u>, 15 Cal. App.3d

7  751 (1971). The court has not found any cases, nor has the

8  defendant cited any, in which § 846 immunity protected officers

9  from liability for injuries to the released prisoner. The purpose

10 of the statute is to prevent police from over-using their arrest

11 power merely to avoid civil liability for harm that results from

12 failure to arrest and detain. "[The power to make an arrest] is

13 strictly limited and the abuse of such power can result in civil

14 liability. It would be contrary to public policy, simultaneously

15 to permit the imposition of civil liability for a failure to

16 exercise the power. Hence the [§ 846] immunity is a logical adjunct

17 to the public policy." <u>Lehto v. City of Oxnard</u>, 171 Cal.App.3d (2d

18 District, 1985). The court concludes that the purpose of the

19 statute is to provide immunity to the public entity or officer from

20 liability for any wrongdoing by a released prisoner that harms a

21 third party. <u>See, e.g.</u>, <u>Hernandez v. City of San Jose</u> 14 Cal.

22 App.4th 129, 134 (1993). ("Many recent cases which have considered

23 what duty a police officers owes to members of the public have

24 concluded the police have no duty to protect individuals from

25 potential *wrongdoers*." (emphasis added.))  Therefore, the court

26 concludes that § 846 immunity does not apply in the circumstances

1  presented.

2      More to the point, however, plaintiffs's wrongful death claim

3  arises from conduct by the defendant other than the mere fact that

4  they released him. Plaintiffs claims are based on false arrest and

5  a subsequent duty to provide medical care to plaintiff, or in the

6  least to assess his medical status, by virtue of the duty created

7  by defendants' custodial relationship with decedent.  These claims

8  are  not  precluded  by  Government  Code  §  846,  as  the  "...

9  [l]egislature has not granted immunity from liability for every act

10  or omission following after the exercise of discretion." <u>Elton v.</u>

11  <u>County of Orange</u>, 3 Cal.App.3d 1053, 1057 (1970) (quoting <u>Sava v.</u>

12  <u>Fuller</u>, 249 Cal.App.2d 281, 284 (1967)).   Finally, of course,

13  plaintiffs seek to impose liability for the circumstances under

14  which the decedent was released, rather than the mere decision to

15  release.

16  **iii. Government Code Section 855.6**

17      Defendant contends that plaintiffs' Sixth Claim is barred by

18  Government Code Section 855.6, which provides in relevant part:

19          "Except for an examination or diagnosis for the purpose
            of  treatment,  neither  a  public  entity  nor  a  public
20          employee acting within the scope of his employment is
            liable  for  injury  caused  by  the  failure  to  make  a
21          physical or mental examination, or to make an adequate
            physical or mental examination, of any person for the
22          purpose of determining whether such person has a disease
            or physical or mental condition that would constitute a
23          hazard to the health or safety of himself or others."

24      While the immunity granted under this section is broad, it has

25  been  held  that  it  does  not  extend  to  a  situation  where  the

26  defendant fails to provide medical care for a prisoner in obvious

27

1  need of such care.    <u>Lucas v. City of Long Beach</u>, 60 Cal. App. 3d

2  341, 349 (1976)  Plaintiffs argue that it is a question of fact

3  whether the government entity had actual or constructive knowledge

4  of such a need for medical care. California law supports this

5  conclusion.   <u>See Zeilman v. County of Kern</u>, 168 Cal.App.3d 1174,

6  1184 (1985).

7  **iv. Government Code Section 855.8(a)**

8      Defendants contend that plaintiffs' Sixth Claim is barred by

9  Government Code Section 855.6, which provides in relevant part:

10              "(a) Neither a public entity nor a public employee
                acting within the scope of his employment is liable for
11              injury resulting from diagnosing or failing to diagnose
                that a person is afflicted with mental illness or
12              addiction or from failing to prescribe for mental
                illness or addiction."
13

14      Plaintiffs do not argue that § 855.8(a) does not apply, but

15  contend that "even assuming that this court accepts defendants'

16  argument on this point, it does not dispense with the entirety of

17  plaintiff's sixth claim for relief."  The court agrees.

18  Section 855.8(a) granting immunity relates to mental illness.

19  Mental illness includes "any condition for which a person may be

20  detained, cared for, or treated in a mental institution." Gov.Code,

21  § 854.4.

22      This statutory immunity covers specific acts and omissions by

23  public employees for failure to diagnose and failure to prescribe.

24   (See Van Alstyne, Cal. Government Tort Liability Practice (1980)

25  § 4.48, p. 399.)  Clearly, Government Code section 855.8,

26  subdivision (a), would protect public entities from errors in

judgment as to whether a patient was mentally ill and therefore should be confined, or whether the patient is not mentally ill and should not be confined. Here, however, the question deals with the failure to refer decedent for evaluation rather than a failure as a result of diagnosis or treatment.

Insofar as defendants are immune from "failing to diagnose" decedent, they still had a duty to act reasonably to protect him while he was in their custody. Plaintiffs have alleged facts that would suggest an alternate theory of liability. When decedent was arrested, he had a laceration on his foot, was covered in vomit, and had trouble walking. While in his holding cell, he allegedly had a seizure. (FAC at ¶¶ 35, 38-39.)  Therefore, to the extent that plaintiffs are alleging that defendants failed to render medical attention to decedent and that decedent was in obvious need of medical care, their claim is not dismissed. Moreover, of course releasing the defendant under the conditions noted, raises further nonimmune questions of liability.

**D. Plaintiffs' Standing as Successor in Interest**

At the time that they filed their complaint, plaintiffs had not yet filed the affidavit required by California Code of Civil Procedure § 377.32 to establish standing as decedent's successor in interest. On November 5, 2010, plaintiffs Jerry Lum and Dorthea Timmons filed a declaration with the court that complies with § 377.32, along with a copy of the decedent's death certificate. ECF No. 23. Defendant's motion to dismiss for lack of standing is therefore DENIED.

1

**IV. CONCLUSION**

2      For the reasons discussed above, Defendant's Motion to

3 Dismiss, ECF No. 20, is DENIED in part and GRANTED in part. The

4 court ORDERS as follows:

5      [1] Defendants' Motion to Dismiss plaintiffs' first claim for

6      relief is DENIED.

7      [2] Defendants' Motion to Dismiss plaintiffs' fifth claim for

8      relief is DENIED as to the City, and GRANTED as to the

9      individual arresting officers.

10     [3] Defendants' Motion to Dismiss plaintiff's sixth claim for

11     relief is GRANTED insofar as plaintiff rely on defendants'

12     failure to diagnose decedent's mental condition. The motion

13     to dismiss is DENIED insofar as plaintiffs allege that

14     decedent was in obvious need of medical attention, and

15     defendants failed to render medical attention to him.

16     [4] Plaintiffs are GRANTED leave to amend their complaint.

17     [5] Defendant's motion to dismiss the first through fifth and

18     seventh claim for relief for lack of standing is DENIED.

19     IT IS SO ORDERED.

20     DATED:  November 17, 2010.

21

22

23                          LAWRENCE K. KARLTON
                            SENIOR JUDGE
24                          UNITED STATES DISTRICT COURT

25

26